**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BETTY JO HIRSCHFIELD-LOUIK DMD, | : | |
| t/a UPTOWN DENTAL, individually and | : | |
| on behalf of all others similarly situated, | : | CIVIL ACTION NO. 2:20-cv-816 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THE CINCINNATI INSURANCE | : | |
| COMPANY; THE CINCINNATI | : | |
| CASUALTY COMPANY; and THE | : | |
| CINCINNATI INDEMNITY COMPANY, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF THE CINCINNATI INDEMNITY**
**COMPANY'S MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT**

Pursuant to Fed.R.Civ.P. 12(b)(6) and L.R. 7.1, Defendant, The Cincinnati Indemnity

Company, and Improperly Named Defendants The Cincinnati Insurance Company and The

Cincinnati Casualty Company (collectively with The Cincinnati Indemnity Company, unless

otherwise stated, "Cincinnati") move to dismiss this case because the Plaintiff fails to state a claim

upon which relief may be granted. Based on the allegations of the Class Action Complaint ("the

Complaint") and the plain language of Cincinnati's insurance policy ("the Policy"), Plaintiff

cannot prove its claims.

**OVERVIEW AND SUMMARY OF ARGUMENT**

The Policy at issue supplies property insurance coverage. It operates to indemnify loss or

damage to property, such as in the case of a fire or storm. Coronavirus (or "COVID-19") does not

damage property; it hurts people. Plaintiff demands the Policy's Business Income, Extended

Business Income, Extra Expense, and Civil Authority coverages. But, because they are part of a

property insurance policy, these coverages protect Plaintiff only for income losses tied to physical damage to property, not for economic loss caused by governmental or other efforts to protect the public from disease. Plaintiff's allegations establish that Plaintiff has not sustained any losses attributable to direct physical loss to property. Rather, Plaintiff alleges that the Coronavirus pandemic spreads COVID-19 among humans. Moreover, the same direct physical loss requirement applies to all of the coverages for which Plaintiff sues—including the Civil Authority coverage.

At bottom, Plaintiff bears the initial burden of showing actual direct physical loss to property. This is always necessary to make a *prima facia* case for property insurance coverage. Yet, Plaintiff's allegations establish that it has not sustained any direct physical loss. Rather, Plaintiff asks this Court to find the Policy applies to cover purely financial losses sustained as a result of COVID-19-related orders requiring non-essential businesses to cease in-person operations. But, because direct physical loss is a fundamental prerequisite to coverage under the Policy, they ask for a vast extension of Pennsylvania law that would create coverage from whole cloth. This should not be permitted.

For all of the reasons, and for the other reasons established below, Plaintiff's Complaint should be dismissed.

## **STATEMENT OF FACTS**

### I.    **Allegations of the Complaint**

The Complaint includes the following allegations:

- At the direction of local, state, and/or federal authorities, and/or due to the COVID-19 public health emergency, Plaintiff was forced to temporarily close her dental office beginning on March 23, 2020, causing and interruption to and loss of Plaintiff's business income. (Compl. at ¶ 2).

- Plaintiff purchased a contract of insurance from Defendant, whereby Plaintiff agreed to make payments (in the form of premiums) to Defendant in exchange for

Defendant's promise to indemnify Plaintiff for losses at the Covered Property, including, but not limited to, business income losses. (Compl. at ¶ 11).

- Plaintiff's contract of insurance with Defendant bears Policy Number ECP0326773 (the "Policy") and is effective for the period of June 1, 2018 to June 1, 2021 (the "Policy Term"). The Policy is attached [to the Complaint as] **Exhibit A.** (Compl. at ¶ 12) (emphasis in original).

- The Policy provides coverage for "direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss." (Compl. at ¶ 16).

- The Policy defines "Loss" as "accidental physical loss or accidental physical damage." (Compl. at ¶ 19).

- The Policy does not define the phrase "accidental physical loss or accidental physical damage." (Compl. at ¶ 20).

- However, the use of the disjunctive "or" in the phrase "accidental physical loss or accidental physical damage" means that coverage is triggered if <u>either</u> a physical loss of property or damage to property occurs. The concepts are separate and distinct and cannot be conflated." (Compl. at ¶ 21) (emphasis in original).

- Physical loss of, or damage to, property may be reasonably interpreted to occur when a covered cause of loss threatens or renders property unusable or unsuitable for its intended purpose or unsafe for ordinary human occupancy and/or continued use. (Compl. at ¶ 22).

- Under the Policy, Defendant agrees to pay for the actual loss of "Business Income" and "Rental Value" sustained by Plaintiff due to the necessary suspension of operations caused by direct "loss" to the "premises". . . . (Compl. at ¶ 24).

- Additional coverage is provided under the Policy for business income losses resulting from an "action of civil authority" which prohibits access to the Covered Property, related to a "Covered Cause of Loss" at property other than the Covered Property. (Compl. at ¶ 25).

- COVID-19 is highly contagious and can be spread exponentially in the community by persons who are symptomatic, asymptomatic or pre-symptomatic. In addition to transmission through airborne respiratory droplets, the COVID-19 virus can physically attach to and stay on surfaces of objects or materials for many days. (Compl. at ¶ 28).

- In response to the COVID-19 public health emergency, on March 6, 2020, the Governor of Pennsylvania declared a "Disaster Emergency" throughout the

Commonwealth of Pennsylvania to control ingress and egress to and from property within the Commonwealth and the movement of persons within it. (Compl. at ¶ 32).

• Thereafter, on March 19, 2020, the Governor of Pennsylvania issued an Executive Order [**"Executive Order"**] closing all non-essential businesses within the Commonwealth, including Plaintiff's business.[1] (Compl. at ¶ 34) (emphasis in original).

• On March 22, 2020 the Secretary of the Pennsylvania Department of Health also issued a "Guidance on COVID-19 for Dental Health Care Personnel in Pennsylvania" (the **"DOH March 22nd Guidance"**) directing that all dental facilities immediately cease all treatment until further notice except for urgent and emergency procedures. (Compl. at ¶ 37) (emphasis in original).

• . . . . On March 23, 2020, the Governor of Pennsylvania issued a "Stay at Home" Order to seven counties in Pennsylvania, including Allegheny County (the **"Governor's Stay at Home Order"**) . . . severely limiting an individual's ability to leave their residence. . . .  (Compl. at ¶ 38) (emphasis in original).

• The DOH March 22nd Guidance was amended on March 26, 2020 (the **"DOH March 26th Guidance"**) which again directed all dental facilities to cease all elective dental procedures and to only treat urgent and emergency patients if the facilities were able to meet certain stringent infection and control requirements. (Compl. at ¶ 38) (emphasis in original).

• On May 8, 2020 the DOH March 26th Guidance was amended to remove the absolute prohibition against elective or non-urgent dental procedures (the **"DOH May 8th Guidance"**). The DOH May 8th Guidance, however, discouraged dental procedures that created visible spray or aerosol permitting such procedures only as a "last resort" if clinically necessary to prevent irreversible damage to the patient and only when proper PPE, per OSHA guidance, was available to the dental practice. (Compl. at ¶ 40) (emphasis in original).

• The closure of all "non-life-sustaining businesses" evidences an awareness on the part of both state and local governments that COVID-19 causes loss of or damage to property. (Compl. at ¶ 42).

• For example, a New York City Executive Order entered on March 16, 2020 specifically acknowledged that: "[COVID-19] physically is causing property loss and damage. . . ." (Compl. at ¶ 43).

---

[1] Plaintiff did not attach a copy of the Executive Order to the Complaint. However, it provided a link to an electronic copy of the order, which is publicly available at: https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf. (*See* Compl. at ¶ 34).

- Similarly, in a March 16, 2020 proclamation, the City of New Orleans acknowledged COVID-19's "propensity to attach to surfaces for prolonged periods of time, thereby spreading from surface to person and causing property loss and damage in certain circumstances." (Compl. at ¶ 44).

- As a result of the orders, guidance and protocols issued by the Governor of Pennsylvania, the Secretary of the Pennsylvania Department of Health, the CDC and OSHA relating to the Plaintiff's practice of dentistry (collectively the **"Mandated Shutdown Rules"**), the Covered Property effectively closed on March 23, 2020 for provision of elective dental procedures with limited re-opening as of June 1, 2020 to provide clinically necessary treatment in cases of non-urgent and non-emergent care. (Compl. at ¶ 47) (emphasis in original).[2]

- Plaintiff has incurred, and continues to incur, among other things, a substantial loss of business income, including additional expenses covered under the Policy due to the constraints to provide elective dental care to patients at the Covered Property because of the Mandated Shutdown Rules. (Compl. at ¶ 48).

- Plaintiff's Covered Property suffered "direct physical loss or damage" due to the Mandated Shutdown Rules requiring Plaintiff discontinue her primary use of the Covered Property. The Mandated Shutdown Rules, in and of themselves, constitute a Covered Cause of Loss within the meaning of the Policy. (Compl. at ¶ 51).

- Alternatively, and to the extent the Mandated Shutdown Rules do not constitute a Covered Cause of Loss within the meaning of the Policy, the COVID-19 public health emergency and the ubiquitous nature of the COVID-19 virus caused a direct physical loss or damage to Plaintiff's Covered Property. (Compl. at ¶ 52).

- Further, and as an additional basis for coverage under the Policy, the ubiquitous nature of the COVID-19 virus caused direct physical loss or damage to property other than Plaintiff's Covered Property, and such loss or damage resulted in an "action by civil authority" prohibiting access to Plaintiff's Covered Property, within the meaning of the Policy. (Compl. at ¶ 53).

The Complaint contains two counts: 1) Declaratory Relief and 2) Breach of Contract. The

breach of contract claim presents questions of contract interpretation for the Court. The claim for

---

[2] Plaintiff's chosen term, "the Mandated Shutdown Rules," is a misnomer and significantly mischaracterizes the various "orders, guidance and protocols" alleged in the Complaint. (*See* Compl. at ¶¶ 27-40, 47). As such, and for brevity, Cincinnati refers to the "orders, guidance and protocols" applicable to Plaintiff's business collectively as "the Orders". (*See* Compl. at ¶¶ 27-40). The Orders as referenced in this Brief **do not** include the New York City Executive Order and City of New Orleans proclamation alleged in the Complaint, as those statements have no bearing whatsoever on Plaintiff's business, which is located exclusively in Pennsylvania. (*See* Compl. at ¶¶ 43-44). But, even if they pertained to Plaintiff's business, which they do not, they are unsupported, conclusory statements. They cite to no scientific evidence or basis. Therefore they should be ignored.

declaratory judgment repeats and is subsumed within the breach of contract claim. The Complaint also seeks certification of a nationwide class.[3] (Compl. at ¶ 54).

## II.     The Plaintiff's Policy

### A.     The Insurance Policy at Issue

Cincinnati issued Policy No. ECP 032 67 73 to Plaintiff BETTY JO HIRSCHFIELD-LOUIK DMD, for a policy period of June 1, 2018 to June 1, 2021. (Ex. A, Policy, p. 6).[4] Cincinnati issued the Policy to Plaintiff in Pennsylvania. The Policy insures Plaintiff's premises in Pittsburgh, Pennsylvania. (Policy, p. 6; *and see* Compl. at ¶ 24).

The pertinent forms are the Building and Personal Property Coverage Form, Form FM 101 05 16 and the Business Income (and Extra Expense) Coverage Form, Form FA 213 05 16 (Policy, pp. 26-65 & 127-135, respectively). The Building and Personal Property Coverage form, FM 101 05 16 is the main property coverage form. The Business Income (and Extra Expense) Coverage form, FA 213 05 16 addresses business income and extra expense. Using the same language, Forms FM 101 and FA 213 supply Business Income and Extra Expense Coverage, but only if the necessary elements for coverage are satisfied. Both forms also contain the Civil Authority coverages at issue in the Complaint.

---

[3] Cincinnati does not address Plaintiff's "Class Action Allegations" because the Complaint does not state a claim on which relief may be granted in the first instance. Cincinnati reserves the right to dispute the class allegations and to dispute class certification in the event this Court denies Cincinnati's Motion to Dismiss.

[4] The Policy is attached as Exhibit A to Plaintiff's Complaint. For the convenience of the Court, that Policy is also attached hereto as Exhibit A and referred to herein as "Policy." Page references are to the Plaintiff's Bates stamped page numbers in the footer of Exhibit A. *See, e.g., Hynoski v. Columbia Cty. Redevelopment Auth.*, 941 F. Supp. 2d 547, 555 (M.D. Pa. 2013) ("The court may . . . take judicial notice of certain facts, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.")

**B.      The Policy's Direct Physical Loss Requirement**

The requirement of "direct physical loss" is a core element in property insurance policies like Plaintiff's, and appears in multiple places in the policy. For example, direct physical loss to the Plaintiff's property is required for Business Income coverage:

> We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by ***direct*** "loss" ***to*** property at "premises" which are described in the Declarations and for which a "Business Income" Limit of Insurance is shown on the Declarations. The "loss" must be caused by or result from a Covered Cause of Loss.

(Policy, pp. 43 & 127) (emphasis added). Covered Cause of Loss is defined as "direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part." (Policy, pp. 30 & 128); "Loss" is defined as "accidental ***physical*** loss or accidental ***physical*** damage." (Policy, pp. 63 & 135) (emphasis added).

Accordingly, there is no Covered Cause of Loss, and therefore no Business Income coverage, unless the insured first establishes, among other things, that there is direct physical loss to covered property.

A Covered Cause of Loss, and thus direct physical loss, is an express requirement for any coverage under the Policy, including the Extra Expense and Civil Authority. (Policy, pp. 44 & 127 (Extra Expense); pp. 44 & 128 (Civil Authority)).[5] Likewise the Policy's Extended Business Income coverage does not apply unless the insured first sustains a "'Business Income' or 'Extra Expense' 'loss' payable under [the Policy]." (Policy, pp. 45 & 129). Thus, direct physical loss is also required for Extended Business Income coverage.

---

[5] Plaintiff alleges that the Governor of Pennsylvania declared a "Disaster Emergency" in part "to control ingress and egress to and from property within the Commonwealth." (Compl. at ¶ 32). However, the Complaint does not appear to seek Ingress and Egress coverage under the Policy. (*See* Ex. A at pp. 130). Even if it did, such coverage also requires a Covered Cause of Loss, *i.e.*, direct physical loss, and, as such, would not apply.

Furthermore, while the definition of Covered Cause of Loss refers to exclusions, exclusions do not come into play unless there is first direct physical loss. *See, e.g., Erie Ins. Grp. v. Catania*, 95 A.3d 320, 322 (2014) ("In actions arising under an insurance policy [Pennsylvania] courts have established a general rule that it is a necessary prerequisite for the insured to establish that his claim falls within the coverage provided by the insurance policy."); *Estate of O'Connell ex rel. O'Connell v. Progressive Ins. Co.*, 2013 PA Super 271, 79 A.3d 1134, 1138 (2013)

C.     **Additional Requirements for Coverage Under the Policy**

Among the requirements for Civil Authority coverage is the requirement of direct physical loss to property other than property at the insured's premises. Additionally, there must be a prohibition of access to the insured's premises.[6] (Policy, pp. 44 & 128).

## ARGUMENT

I.     **Motion to Dismiss Standard**

Dismissal is an appropriate mechanism here because this motion presents a pure question of law. A motion to dismiss for failure to state a claim should prevail if, after the complaint's allegations are taken as true and all reasonable inferences are made in favor of the nonmoving party, the nonmoving party cannot prove facts supporting its claim. *See, e.g., Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011), *citing Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). To survive a motion to dismiss, a complaint must contain sufficient factual matter to show the claim for relief is "plausible on its face." *Warren Gen. Hosp.*, 643 F.3d at 84; *and see Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), *citing Twombly,* 550 U.S. at 570. A claim does not meet the plausibility standard

---

[6] There are other requirements for Civil Authority coverage that Cincinnati does not rely on for this Motion. However, Cincinnati does not waive the right to raise those requirements at a later time.

unless it includes enough factual content to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Importantly, legal conclusions and other unsupported conclusions stated in the Complaint may not be considered in determining a motion to dismiss. *See, e.g., Iqbal,* 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); *Fischbein v. Olson Research Grp., Inc.*, 959 F.3d 559, 561 (3d Cir. 2020) (In determining whether plaintiff has stated a claim sufficient to survive a motion to dismiss, the Court "disregard[s] threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements."); *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007), *cert. denied*, 552 U.S. 1021 (2007) (On a motion to dismiss, the Court does not accept as true "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation.") (internal citations and quotations omitted).

Additionally, the Court should consider the insurance Policy and the Orders in ruling on this motion. *See, e.g., Doe v. Univ. of Sciences*, 961 F.3d 203 (3d Cir. 2020) ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint[,] exhibits attached to the complaint, and matters of public record. In addition, 'a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.'") (alteration in original; internal citations omitted); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."). As noted, the Complaint is attached as an Exhibit to the Complaint. The Orders are matters of public record.

Here, the Complaint's allegations are in conflict with the terms of the Policy and the Orders. This means that the Policy and the Orders control. *See, e.g.*, *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859, n. 8 (3d Cir. 1994) ("Where there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control."); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1327 & n. 22 (4th ed.) (Wright & Miller) ("It appears to be well settled that when a disparity exists between the written instrument annexed to the pleadings and the allegations in the pleadings, the terms of the written instrument will control, particularly when it is the instrument being relied upon by the party who made it an exhibit.") (collecting cases).

Indeed, dismissal for failure to state a claim is appropriate where, as here, the plain and unambiguous language of the parties' contract shows the plaintiff cannot "plausibly allege" its contradictory interpretation. *D & M Sales, Inc. v. Lorillard Tobacco Co.*, No. CIV.A.09-2644, 2010 WL 786550, at *4 (E.D. Pa. Mar. 8, 2010) (Padova, D.J.). In this context, any amendment of the complaint would be futile since "[p]laintiff cannot state a claim in light of the controlling contractual terms." *D & M Sales, Inc.*, No. CIV.A.09-2644, 2010 WL 786550, at *4.

## II.     There is No Direct Physical Loss and Therefore No Coverage

As shown, the Policy only provides coverage where there is direct physical loss. But, the Complaint does not allege facts showing any direct physical loss to any property. The mere presence of the virus on a premises does not constitute direct physical loss. But even assuming that it did, Plaintiff does not even allege the virus was present at its premises. Rather, it summarily alleges the Orders and the "ubiquitous nature" of the COVID-19 virus "caused physical loss or damage" to its property. (*See, e.g.*, Compl. at ¶¶ 51-53). As such, Plaintiff cannot possibly prove

its claim.

### A.    There Are No Facts to Show Plaintiff's Property was Physically Altered, thus there is No Direct Physical Loss

Plaintiff asks the Court to create coverage where there is none. This is not allowed. Under Pennsylvania law, "When the terms of an insurance policy are clear and unambiguous, the court is bound to give effect to the policy and cannot interpret the policy to mean anything other than what it says." *Reeves v. Travelers Companies*, 296 F. Supp. 3d 687, 691 (E.D. Pa. 2017) (Baylson, J.) (internal quotations omitted), *citing Clarke v. MMG Ins. Co.*, 100 A.3d 271, 275 (Pa. Super. Ct. 2014); *Byoung Suk An v. Victoria Fire & Cas. Co.*, 113 A.3d 1283, 1288 (2015) (It is "well settled" that "courts should not 'under the guise of judicial interpretation,' expand coverage beyond that provided in the policy."), *citing Guardian Life Ins. Co. of America v. Zerance,* 505 Pa. 345, 479 A.2d 949, 953 (1984).

No case, in Pennsylvania or elsewhere, has held that the existence of a virus constitutes direct physical loss to property such as buildings. Moreover, even if the Coronavirus could cause direct physical loss to property, which it cannot, the only loss alleged here is not physical loss to property, but a purely financial loss. (Compl. at ¶¶ 23-25 & 48). As such, Plaintiff cannot plausibly argue that the virus or the Orders caused any physical alteration to its property that could trigger coverage.

### 1.    Pennsylvania Law Requires Physical Alteration to Property; There is None Here

Financial losses unrelated to physical loss or physical damage at the insured premises do not satisfy the Policy's direct physical loss requirement. *Philadelphia Parking Authority v. Fed. Ins. Co.,* 385 F. Supp. 2d 280 (S.D.N.Y. 2005) (applying Pennsylvania law), is analogous to this case. There, the plaintiff operated a parking garage at the Philadelphia International Airport.

*Philadelphia Parking Auth.*, 385 F. Supp. 2d at 281. Since its garage depended on the airport to attract customers, it sustained a significant loss of business when the FAA grounded all flights in the United States following the 9/11 terrorist attacks. *Philadelphia Parking Auth.*, 385 F. Supp. 2d at 282-283. Plaintiff sought business income, extra expense, and civil authority coverage under its property insurance policy.

The business income, extra expense, and civil authority coverage provisions in *Philadelphia Parking Authority* were substantially similar to those in the Policy here. Philadelphia Parking Authority's business income coverage applied to the insured's loss of income during the "period of indemnity" in the event of an actual interruption of the insured's business, provided that the "actual interruption of [Philadelphia Parking Authority's] operations [was] caused by ***direct physical loss or damage*** caused by a covered cause of loss . . . ." *Philadelphia Parking Auth.*, 385 F. Supp. 2d at 282 (emphasis added). Similarly, the civil authority coverage only applied in the event "a civil authority ***prohibits*** access to [Philadelphia Parking Authority's] covered property because of ***direct physical loss or damage*** caused by a covered cause of loss to property not otherwise excluded in the vicinity of [Philadelphia Parking Authority's] covered property." *Philadelphia Parking Auth.*, 385 F. Supp. 2d at 282 (emphasis added).

*Philadelphia Parking Authority* holds that these provisions unambiguously require that "a 'covered cause of loss' . . . result in some 'direct physical loss or damage,' which in turn must interrupt the insured's business operations." And, "***the claimed loss or damage must be physical in nature***." *Philadelphia Parking Auth.*, 385 F. Supp. 2d at 288 (emphasis added). *Philadelphia Parking Authority* dismisses the complaint because it did not allege any physical loss or damage to the parking garage or other property in its vicinity. *Philadelphia Parking Auth.*, 385 F. Supp. 2d

at 287. As such, the claim "clearly [did] not fit the plain language of the Business Income Provision." *Philadelphia Parking Auth.*, 385 F. Supp. 2d at 287.

Here, Plaintiff's factual allegations show there was no direct physical loss. Plaintiff alleges that financial losses it sustained because of the Orders and the "ubiquitous nature" of COVID-19 constitute direct physical loss. (*See, e.g.,* Compl. at ¶¶ 20-22). But, like the virus, the Orders did not physically alter any property. Rather, the Complaint alleges, the Orders caused the Plaintiff to sustain "a substantial loss of business income, including additional expenses . . . due to the constraints to provide elective dental care to patients at the Covered Property." (Compl. at ¶ 48). But, Plaintiff admits this was done to prevent exposure to a virus. (*See, e.g.*, Compl. at ¶ 45, quoting *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 891 (Pa. 2020)) ("Covid-19 does not spread because the virus is 'at' a particular location. Instead it spreads because of person-to-person contact[.]"); (*and see*, Compl. at ¶ 34, *citing* Executive Order, Mar. 19, 2020).[7] Humans infecting humans—through direct contact, or otherwise—is not direct physical loss to property.[8] Moreover, although Plaintiff is wrong that the presence of the virus constitutes direct physical loss, nowhere in its Complaint does Plaintiff assert the Coronavirus was present at its premises.

_____

[7] *Wolf* concerned whether the Pennsylvania Governor's Executive Order constituted a valid exercise of the Governor's Police Power, and did not involve insurance coverage or suggest in any manner that the Coronavirus causes physical loss or physical damage to property. Instead, the Pennsylvania Supreme Court found the Executive Order was reasonable and enforceable in light of its express purpose—to protect the health of Pennsylvania residents by enforcing social distancing measures. *See*, *Wolf*, 227 A.3d at 880 & 895-896 ("By its terms, the Executive Order compels the closure of all businesses in the state deemed to be non-life-sustaining to prevent the spread of COVID-19 by limiting person-to-person interactions through social distancing." And, "[t]he Executive Order results in only a temporary loss of the use of the Petitioners' business premises, and the Governor's reason for imposing said restrictions on the use of their property, namely to protect the lives and health of millions of Pennsylvania citizens, undoubtedly constitutes a classic example of the use of the police power to 'protect the lives, health, morals, comfort, and general welfare of the people[.]'")

[8] The Court may take judicial notice of the fact that essential businesses were permitted to remain open, even where the presence of COVID-19 was confirmed. And, further, that the Orders permitted Plaintiff's premises to remain open for urgent, emergency or other non-elective dental procedures. (*See, e.g.*, Compl. at ¶¶ 37, 39-40, 47-48). Thus, the Orders were not issued as a result of any direct physical loss to anybody's property.

In essence, Plaintiff asserts that the Policy's direct physical loss requirement is met whenever a business suffers economic harm. This is contrary to *Philadelphia Parking Authority* and a host of other cases holding that direct physical loss requires actual, tangible, permanent, physical alteration of property, as discussed below.

### 2. *Philadelphia Parking Authority* **is to the Same Effect as the Prevailing Law Nationally**

*Philadelphia Parking Authority* is consistent with the prevailing law nationally. *See, e.g.*, 10A *Couch on Ins.* § 148:46 ("The requirement that the loss be 'physical,' given the ordinary definition of that term, **is widely held** to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.") (Emphasis added) (collecting cases); *see also Source Food Tech., Inc. v. U.S. Fid. & Guar. Co.,* 465 F.3d 834 (8th Cir. 2006) (applying Minnesota law); *Pentair, Inc. v. Am. Guarantee & Liab. Ins. Co.*, 400 F.3d 613 (8th Cir. 2005) (applying Minnesota law); *Great Plains Ventures, Inc. v. Liberty Mut. Fire Ins. Co.*, 161 F. Supp. 3d 970, 978-979 & n. 4 (D. Kan. 2016) (applying Kansas law) (the phrase "physical loss or damage" "***unambiguously***" requires "***physical alteration***" of property) (emphasis added); *NE. Georgia Heart Ctr., P.C. v. Phoenix Ins. Co.*, No. 2:12-CV-00245-WCO, 2014 WL 12480022, at *6 (N.D. Ga. May 23, 2014) (applying Georgia law) ("The court will not expand 'direct physical loss' to include loss-of-use damages when the property has not been physically impacted in some way. To do so would be equivalent to erasing the words 'direct' and 'physical' from the policy."); *J. O. Emmerich & Assocs., Inc. v. State Auto Ins. Companies*, No. 3:06CV00722-DPJ-JCS, 2007 WL 9775576, at *3 (S.D. Miss. Nov. 19, 2007) ("Plaintiff's interpretation of the [insurance] contract would render the words 'direct' and 'physical' meaningless in the context of the policy.") (collecting cases); *Mastellone*, 2008-Ohio-

311, ¶ 68, 175 Ohio App. 3d 23, 884 N.E. 2d 1130, 1144 (2008) (no direct physical loss because mold could be removed via cleaning, and its presence did not alter or otherwise affect the structural integrity of the siding), *citing* 10A *Couch on Ins.* § 148:46 (3d Ed.1998).

*Source Food Tech., Inc.* is a seminal case concerning the direct physical loss requirement. There, an embargo on the importation of Canadian beef due to mad cow disease prevented a truck carrying the insured's beef product, which was not itself contaminated, from crossing the border. *Source Food Tech., Inc.,* 465 F.3d at 835. As a result, the insured sustained significant financial losses because it could not fill its customers' orders. *Id.*

Source Food claimed lost business income under its insurance policy. That policy, like the Policy here, covered the suspension of business operations "caused by *direct physical loss to Property*". *Id.* (Emphasis in original). Source Food argued "that the closing of the border caused direct physical loss to its beef product because the beef product was treated as though it were physically contaminated by mad cow disease and lost its function." *Id.* at 836. *Source Food* rejects this argument: "To characterize Source Food's inability to transport its truckload of beef product across the border and sell the beef product in the United States as direct physical loss to property would render the word 'physical' meaningless." *Id.* at 838.

*Pentair* is to the same effect. *Pentair* rejects the insured's contention that its Taiwanese suppliers' inability to function after a loss of power caused by an earthquake constituted direct physical loss or damage. *Pentair, Inc.*, 400 F.3d at 616. *Pentair* holds that loss of use or function can be relevant to determining the amount of loss, *but only once the insured first establishes physical loss or damage*. *Id.* ("Pentair's argument, if adopted, would mean that direct physical loss or damage is established *whenever* property cannot be used for its intended purpose.") (Emphasis in original).

Source Food and *Pentair* are well-reasoned cases and should be followed. Moreover, there are no material differences between Minnesota's and Pennsylvania's respective decisions on pertinent insurance law issues. Both states seek to apply the plain meaning of an insurance policy. *See, e.g., Reeves v. Travelers Companies*, 296 F. Supp. 3d at 691, *citing Clarke*, 100 A.3d at 275 (Pa. Super. Ct. 2014); *Guardian Life Ins. Co. of America v. Zerance,* 479 A.2d at 953; *accord, Depositors Ins. Co. v. Dollansky*, 905 N.W.2d 513, 515 (Minn. Ct. App. 2017), *aff'd*, 919 N.W.2d 684 (Minn. 2018). As such, it is appropriate for this Court to follow the sound construction and application of the "direct physical loss" requirement stated in so many cases, including *Philadelphia Parking Authority, Source Food*, and *Pentair*.

Further, emerging decisions concerning recent claims similar to Plaintiff's show that there is no physical loss or physical damage as required for coverage under similarly worded policies. They hold that the Coronavirus and related closure orders do ***not*** cause "physical," i.e., actual, tangible, structural, loss or damage to property. *See, e.g., Gavrilides Management Company et al. vs. Michigan Insurance Company*, Case No. 20-258-CB-C30 (July 2, 2020, Ingham County) ("Direct physical loss of or damage to the property "has to be something with material existence. Something that is tangible. Something . . . that alters the physical integrity of property."); *Social Life Magazine, Inc. v. Sentinel Ins. Co., Ltd.*, 1:20-cv-03311-VEC (S.D.N.Y.), ECF No. 24-1 at pp. 5 & 15 (the Coronavirus damages lungs; not printing presses).[9]

Here, as in the precedents Cincinnati relies on, there was no direct physical loss to Plaintiff's property. Plaintiff does not allege that the Coronavirus physically altered its property.

---

[9] No written opinions have been issued in *Gavrilides Management Company* and *Social Life* at the time of filing this brief. The oral arguments and the Court's oral ruling in *Gavrilides* are available for viewing on YouTube: https://www.youtube.com/watch?v=Dsy4pA5NoPw&feature=youtu.be. A copy of the hearing transcript and related Order are also attached for the Court's convenience as Exhibit C. A copy of the hearing transcript in *Social Life* is available through the Federal Court's filing system, PACER, and is attached for the Court's convenience as Exhibit D.

Indeed, even at premises where (unlike Plaintiff's) the virus has been confirmed to be present, such as hospitals and nursing homes, the buildings have remained open. This is because those buildings and properties are themselves undamaged.

The financial losses Plaintiff asserts do not constitute direct physical loss. Thus there can be no Business Income or Extra Expense coverage here.

### B.    Coronavirus Does Not Affect the Structural Integrity of Property Because it Can Be Removed by Cleaning

There is no direct physical loss in situations where a contaminant or substance can be cleaned. *See*, *e.g.*, *Mastellone*, 2008-Ohio-311, ¶ 68 (no direct physical loss because mold could be removed via cleaning, and its presence did not alter or otherwise affect the structural integrity of the siding), *citing* 10A *Couch on Ins.* § 148:46 (3d Ed.1998); *Mama Jo's, Inc. v. Sparta Ins. Co.,* 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018) ("[W]ith regards to Plaintiff's initial claim for cleaning, cleaning is not considered direct physical loss."); *Universal Image Prods., Inc. v. Chubb Corp.*, 703 F.Supp.2d at 710 (E.D. Mich. 2010) (a complete cleaning of a ventilation system was not a direct physical loss), *aff'd*, 475 Fed.Appx. 569 (6th Cir. 2012).

The Centers for Disease Control and Prevention (CDC) instruct that the Coronavirus can be wiped off surfaces by cleaning: "The virus that causes COVID-19 can be killed if you use the right products. EPA has compiled a list of disinfectant products that can be used against COVID-19, including ready-to-use sprays, concentrates, and wipes." (*See* CDC Reopening Guidance for Cleaning and Disinfecting (4/28/2020), attached as Exhibit B; *See also* CDC, *Cleaning and Disinfection for Households*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cleaning-disinfection.html (accessed July 22, 2020)).[10]

---

[10] Again, this Court may take judicial notice of the CDC reports and other matters of public record without converting Cincinnati's motion to dismiss to a motion for summary judgment. *See, e.g., Hynoski*, 941 F. Supp. 2d at 555.

Plaintiff suggests that its temporary loss *of use* of its property for elective procedures is covered because, according to Plaintiff, the Policy applies "if <u>either</u> a physical loss *of* property <u>or</u> damage *to* property occurs." (Compl. at ¶ 21) (underlining in original; bolding and italics added). Plaintiff blatantly misstates the Policy's coverage. The plain language of the Policy requires direct *physical* loss *to* property or direct *physical* damage *to* property. As established above, the Policy language itself controls here, not the misstatement of that language. Plaintiff also disregards that the myriad of cases addressing the issue consider, and reject, loss *of use* as equivalent to the direct *physical loss* (or direct physical damage) *to* property. (*See* Policy at pp. 43-44 & 127-128). Instead, the focus of the courts' analysis is on the Policy's requirement that the loss or damage must be "direct" and "physical". *See* Section II.A & B., *infra*.

Thus, even where the Coronavirus is or was actually present, there is no direct physical loss because the virus either dies naturally in a short time, or it can be wiped away.

## III. There Is No Civil Authority Coverage

As established, the Policy's Civil Authority coverage only applies if there is a Covered Cause of Loss, meaning direct physical loss that is not excluded or limited, to property other than the Plaintiff's property. Even then, there is only Civil Authority coverage if, among other things, the action of the civil authority prohibits access to the insured premises. (Policy, pp. 44 & 128). "[L]osses due to curfew and other such restrictions are not generally recoverable. * * * If a policy provides for business interruption coverage where access to an insured's property is denied by order of civil authority, access to the property must actually be specifically prohibited by civil order, not just made more difficult or less desirable." 11A *Couch on Ins.* § 167:15.

### A.       There is No Direct Physical Loss to Other Property

Cincinnati has demonstrated that direct physical loss to property other than the Plaintiff's property is necessary. Courts nationwide have upheld that requirement. *See, e.g., Philadelphia Parking Auth.*, 385 F. Supp. 2d at 289 (applying Pennsylvania law); *Kelaher, Connell & Conner, P.C. v. Auto-Owners Ins. Co.,* 2020 WL 886120, 8 (D.S.C. Feb. 24, 2020); *Not Home Alone, Inc. v. Philadelphia Indem. Ins. Co.,* 2011 WL 13214381, 6 (E.D. Tex. Mar. 30, 2011); *S. Texas Med. Clinics, P.A. v. CNA Fin. Corp.,* 2008 WL 450012, 10 (S.D. Tex. Feb. 15, 2008); *United Air Lines, Inc. v. Ins. Co. of State of PA*, 439 F.3d 128, 131 (2d Cir. 2006).

Just as the Coronavirus is not causing direct physical loss to the Plaintiff's premises, it is not causing direct physical loss to other property. Plaintiff fails to identify any distinct, demonstrable, physical alteration of property, anywhere. Rather, it alleges the Orders have required Plaintiff to temporarily cease providing "elective" dental procedures. (*See, e.g.*, Compl. at ¶¶ 37, 39-40, 47-48). No facts are alleged that demonstrate that these things happened because of direct physical loss to anybody's property. Instead, as the Plaintiff admits, closing or limiting of business operations protected the public from human to human transmission of the virus: "Pennsylvania Governor Wolf's order dated March 19, 2020 . . . was issued to protect the lives and health of millions of Pennsylvania citizens." (Compl. at ¶ 21; *and see* Compl. at ¶¶ 18-19).

There are no alleged facts asserting any direct physical loss. There are no alleged facts showing any change or alteration of anybody's physical property by the Coronavirus or the Closure Orders. There are, however, facts showing that the Coronavirus can be removed via cleaning. As established, this is the marker of something that is ***not*** direct physical loss. Accordingly, there is no direct physical loss to any other property as is required for Civil Authority coverage.

**B.      The Requisite Prohibition of Access Is Lacking**

The Civil Authority coverage also requires that access to Plaintiff's premises be prohibited by an order of civil authority. But, the Plaintiff does not allege the Orders prohibited access to its premises. Nor could it. Under the Orders, non-essential businesses, including Plaintiff's business, remained open and accessible to owners, employees and others so that they could perform "minimum basic operations."[11] Furthermore, the Closure Orders expressly permitted dental offices like Plaintiff's to remain open to customers for urgent, emergency and other non-elective procedures. (Compl. at ¶ 21; *and see* Compl. at ¶¶ 18-19). Because there was no prohibition of access, there is no Civil Authority coverage.

The prohibition of access requirement is pervasive and has been enforced nationally. As discussed, the insured parking garage owner in *Philadelphia Parking* failed to show the FAA's order grounding flights after 9/11 prohibited access to its premises, as required for civil authority coverage under Pennsylvania law. Likewise, in *Ski Shawnee, Inc. v. Commonwealth Ins. Co.,* 2010 WL 2696782, 4 (M.D. Pa. July 6, 2010), a bridge repair hindered or dissuaded the majority of customers from visiting a ski resort., but did not constitute prohibition of access to the premises.

To the same effect is *Southern Hospitality, Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137 (10th Cir. 2004) (applying Oklahoma law) (access to hotels was not prohibited by FAA order grounding flights in response to 9/11 attacks). *See also*, *e.g.*, *Syufy Enterprises v. Home Ins. Co. of Indiana*, 1995 WL 129229, 2 (N.D. Cal. Mar. 21, 1995) (riot-related curfew prevented insured's customers from being out and about, it did not prohibit access to the insured's premises); *Bros., Inc. v. Liberty Mut. Fire Ins. Co.,* 268 A.2d 611, 614 (D.C. 1970) (same); *Schultz Furriers, Inc. v Travelers Cas. Ins. Co. of America*, 2015 WL 13547667, 6 (N.J. Super. L. July 24, 2015) (despite serious traffic

---

[11] https://www.governor.pa.gov/wp-content/uploads/2020/04/Life-Sustaining-Business-Frequently-Asked-Questions-4.20.20-2.pdf (*See* pg. 4 at ¶ 14).

issues in lower Manhattan following Superstorm Sandy, it was not completely impossible for the public to access the insured store). *See also, Goldstein v Trumbull Ins. Co*., 2016 WL 1324197, 12 (N.Y. Sup. Ct. Apr. 05, 2016); *TMC Stores, Inc. v. Federated Mut. Ins. Co*., 2005 WL 1331700, 4 (Minn. Ct. App. June 7, 2005).

Because the Complaint's allegations establish access was not prohibited, the Civil Authority coverage does not apply.

## IV.    Conclusion

For the reasons established above, Cincinnati's Motion to Dismiss should be granted.

July 24, 2020.

Respectfully submitted,

/s/ *Trisha A. Gill*
Trisha A. Gill, Esquire
PA. ID #83751
Litchfield Cavo LLP
Two Gateway Center
603 Stanwix Street, 10th Floor
Pittsburgh, PA 15222
(412) 291-8240
gill@litchfieldcavo.com

Counsel for Defendants